IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ELLSWORTH LARSON,              )
                               )
            Plaintiff,         )
                               )
      v.                       )    1:06CV00328
                               )
OLD DOMINION FREIGHT LINE, INC. )
EMPLOYEE BENEFIT PLAN and BENEFIT )
MANAGEMENT SERVICES, INC.,     )
                               )
            Defendants.        )

### RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

This case comes before the Court on the parties' cross motions for summary judgment. Plaintiff Ellsworth Larson seeks a declaratory judgment that he is entitled to long term disability income benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Defendants Old Dominion Freight Line, Inc. Employee Benefit Plan ("the Plan") and Benefit Management Services, Inc. ("BMS") move for summary judgment on the ground that their termination of benefits in Plaintiff's case was reasonable in light of all the evidence.[1]

### Facts

Old Dominion Line, Inc. ("Old Dominion") provides both long and short term disability benefits to qualified participants through its employee benefit plan (the "Plan"). Plaintiff, who

---

[1] The complaint alleges that BMS was the independent claims administrator, but Defendants clarify that the administrator actually was Old Dominion Line, Inc. (Docket No. 17 at 2.) Thus, when the term "Defendants" is used, this will actually refer to the actions of Old Dominion as the Plan Administrator. Reading between the lines, it appears that BMS may have made the first two decisions to deny benefits on behalf of Old Dominion, which made the final decision.

worked as a truck driver for Old Dominion, filed a claim for short term disability benefits under the Plan in September 2001 following a rotator cuff tear. He subsequently began receiving disability benefits and underwent surgery to repair his rotator cuff. While Plaintiff recovered well following his shoulder surgery, he also began reporting significant lower back and right leg pain shortly thereafter. When an MRI revealed a herniated disc and epidural fibrosis, Plaintiff underwent back surgery in February 2002.

Plaintiff's short term disability benefits expired in December 2001, but he began receiving long term disability ("LTD") benefits under the Plan at that time due to his back injury. In 2002, Plaintiff disclosed to his treating physicians that (1) "there is no such thing as light duty at his work," (2) he was due to retire in five years, i.e., in 2007 (R. at 164), and (3) because he had been declared totally disabled by social security, he did not plan to return to work (R. at 155). However, in May 2003, Defendants discovered that Plaintiff had not been under a physician's care, as required by the Plan's terms, since June 2002. As a result, Defendants terminated his LTD benefits in a letter of May 9, 2003. (R. at 151.)

Less than one month after Defendants discontinued his benefits, Plaintiff returned to his treating physician, Dr. S. Scott Stewart ("Dr. Stewart"), reporting increased pain. Dr. Stewart opined, based on his examination and Plaintiff's self-reported pain, that Plaintiff should be excused from work pending the results of a functional capacity evaluation ("FCE"). (R. at

150.) Although Dr. Stewart described the FCE as "difficult to interpret because of pain levels preventing Mr. Larson from giving full effort," he nevertheless concluded, based on Plaintiff's reports of pain alone, that he was not employable. (R. at 135.) Plaintiff's LTD benefits were apparently reinstated on Dr. Stewart's recommendation.

In early 2004, because two years had passed since his initial back surgery, the requirements for receiving disability under the Plan increased, presenting another obstacle to continued benefits. In pertinent part, the Plan provides that "[b]eginning twenty-four (24) months after the disability began, to be considered to be totally disabled, you must not be able to engage in *any* gainful occupation for which you are reasonably qualified by education, training, or experience." (R. at 3)(emphasis added). Thus, beginning in 2004, Plaintiff had to demonstrate that he was unable to perform *any* work, including a sedentary job. In contrast, during his first two years of LTD benefits, Plaintiff only had to show that he was unable to return to work as a truck driver.

In an effort to adequately evaluate Plaintiff's work capacity, Defendants ordered a new FCE report in March 2004, which concluded that Plaintiff could perform up to medium physical demand occupations. (R. at 126-126.) Dr. Stewart reviewed the FCE report, and while he acknowledged that it "showed consistent and reliable performance," he also wrote that he suspected that "because of pain considerations, Mr. Larson will not be able to continue in a medium physical demand category job for any length of

-3-

time without reinjuring himself" and that "it is unlikely that he will be able to do even a sedentary job." (R. at 123.)

In October 2004, the Plan Administrator requested that Plaintiff undergo an independent medical examination ("IME") with respect to his lower back pain. After Dr. T. Hemanth Rao examined Plaintiff and reviewed the medical records and FCE, he concluded that Plaintiff "could take part in gainful employment in a sedentary position." (R. at 56.) He also noted, however, that "give[n] the patient's prominent pain symptoms as well as MRI findings of epidural fibrosis, he may be a candidate for endoscopic scar tissue removal if the pain continues to limit his ability to function." (Id.) Among Plaintiff's "pain symptoms," Dr. Rao lists "an antalgic gait with a tendency to limp and favor his right lower extremity." (Id.)

On October 12, 2004, less than a week after Plaintiff's appointment with Dr. Rao, Plaintiff was notified that his LTD benefits had been terminated. (R. at 116.) The termination letter from BMS merely informed Plaintiff that "[b]ased on the documentation in our file and recent Independent Medical Exam, you are able to perform other work." (Id.) The letter also explained the right to appeal. (Id.) In support of the appeal, Plaintiff submitted his own affidavit, dated March 9, 2005. In it, Plaintiff states that "there is always some level of pain present in my low back and right leg," and that "this pain increases if I do almost anything too long. If I stand for more than 10-15 minutes or walk more than 20 minutes, my back pain increases and I have to sit down

or do something for the pain." (R. at 88.) He described his right hip and leg pain as being more severe than his back pain.

> Like the back pain, it is constantly there but it gets worse with activity. If I stand or walk for more than 15-20 minutes I have to take a break and sit down or rest because of increased pain and numbness in my right hip and leg. I do not do any bending or stooping and I do not try to pick up or carry much of anything. Those kinds of activities aggravate my back and leg pain.

(Id.) Plaintiff reported his daily activities as being severely limited as follows:

> I will do some light household chores around the house to help my wife since she still works. I usually do a few things and then take a break for 20 minutes or so. I will go with my wife to the grocery store but I have to lean on the buggy for support and I do not pick up any of the items off of the shelves. My wife has to load the groceries in the car and unload them when we get home. The only thing I am able to carry in is something light like a loaf of bread.

(R. at 89.)

In the process of weighing Plaintiff's appeal, Defendants also arranged for video surveillance of Plaintiff. On March 30, 2005, just three weeks after Plaintiff signed the affidavit detailed above, Plaintiff was observed picking up several large, heavy bags of fertilizer and/or seed at Lowe's, a home improvement store, and loading them into his vehicle. The video also shows Plaintiff unloading and carrying the bags without difficulty, pouring the contents into a spreader, and walking behind the spreader for nearly two hours, turning and refilling as needed. Plaintiff took no breaks during his yard work. The footage next shows Plaintiff stooping to pick up objects from the ground as well as carrying and

pulling several trash cans.  At no time did Plaintiff demonstrate a limp or any other sign of limited mobility.

After reviewing Plaintiff's medical records, FCE reports, the IME, and the surveillance video, Defendants denied Plaintiff's appeal.  In the denial letter sent by BMS on April 25, 2005, Defendants again simply assert that Plaintiff "is capable of performing in at least a sedentary position."  (R. at 16.)  They also note the availability of a second and final administrative appeal.  (Id.)  On November 21, 2005, Plaintiff, through counsel, submitted a second appeal, which included a second affidavit from Plaintiff.  (R. at 200-221.)  For this appeal, and particularly in his affidavit, Plaintiff claims that he occasionally has good days and is able to "do some things that I want to do."  He also states: "I have never said that I am unable to do anything."  (R. at 220-221.)  Plaintiff also submitted Dr. Stewart's September 27, 2005 letter where the doctor apparently considered the impact of the surveillance video and said that yard work was not "inappropriate" and that Plaintiff could perform such work one day, but may "pay for it" the next.  (R. at 219.)

On December 21, 2005, Defendants denied Plaintiff's second appeal.  (R. at 222-224.)  In the denial letter, the Plan Administrator finally set out a detailed analysis of the entire record, including Plaintiff's additional submissions, and explains how and why he weighed conflicting evidence.  In particular, Defendants discuss their decision to discredit Plaintiff's subjective evaluations of pain and Dr. Stewart's assessments in

light of contrary evidence in the FCE reports, surveillance video, and IME. (Id.) In the present action, Plaintiff contends that Defendants abused their discretion by terminating his LTD benefits and failed to provide a full and fair review of his claim on appeal.

**Standard of Review**

When, as in the present case, an ERISA plan administrator has discretion in administering its plan, a court generally should use an abuse of discretion standard to review a plan administrator's determination. Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 86 (4th Cir. 1993). However, when the plan is both insured or funded and administered by the same party, a conflict of interest may exist. Id. In such cases, a modified abuse of discretion standard is necessary to counterbalance the fiduciary's potential to place its own financial interests above the interests of the insured. Id. at 87. "[T]he fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." Id. Under this standard, the courts will uphold an administrator's decision only if it is reasonable when taking the conflict into consideration. Carolina Care Plan, Inc. v. McKenzie, 467 F.3d 383, 387 (4th Cir. 2006).

-7-

Because "Defendants" may have both funded[2] and administered the long-term disability plan in question, a modified abuse of discretion standard of review could be appropriate in the present case. When applying this standard, courts should consider the following nonexclusive factors, known as Booth factors, in assessing the reasonableness of Defendants' decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Carolina Care Plan Inc., 467 F.3d at 387(citing Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000)). Therefore, out of an abundance of caution, the Court will review Defendants' decision to terminate Plaintiff's LTD benefits to "ensure that it is consistent with the exercise of discretion by a fiduciary acting free of conflict and that the Plan met its duty under ERISA to conduct a full and fair review of the claim." Williamson v. A.T. Massey Coal Co., Inc., 56 F. Supp. 2d 656, 658 (S.D. W. Va. 1998)(internal citations omitted).

---

[2] The Defendants do not meaningfully discuss whether the heightened review standards apply to this case, making their brief in support of summary judgment possibly deficient and certainly less helpful. Plaintiff, on the other hand, makes the conclusory statement that Defendants operate a self-funded Plan and refers to something he calls "Document 8, ¶ 6," but does not indicate where this document is to be found. (Pl.'s Br. at 9.)

-8-

## **Discussion**

In this case, Plaintiff alleges that Defendants failed to adequately consider all materials and comply with ERISA's procedural requirements in conducting their reviews of his eligibility for LTD benefits. Plaintiff also questions the motives and potential conflicts of interest leading to the termination of his benefits and the overall reasonableness of Defendants' decision making process.

The allegations of procedural violations present the issue of whether the case has been adequately and fairly developed so that it is ripe for decision.[3] This issue also, in part, involves the Booth factors of whether all relevant evidence was considered and whether the decision or decision process was flawed in some way.

The allegations of procedural impropriety stem, at least in part, from Defendants' failure to strictly comply with the notice requirements set forth by ERISA. The statute requires Defendants to give Plaintiff specific reasons for the termination of his benefits and afford him a reasonable opportunity for a "full and fair review" of that decision. Specifically, ERISA requires that plan administrators:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

---

[3]As a result of the procedural violations, Plaintiff requests that his benefits be restored. At most, however, the case would normally be remanded for a correction of the procedural violation. Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993).

-9-

>    (2) afford a reasonable opportunity to any participant
>    whose claim for benefits has been denied for a full and
>    fair review by the appropriate named fiduciary of the
>    decision denying the claim.

29 C.F.R. § 2560.503-1. This section further explains that adequate notice must include:

>    (1) The specific reason or reasons for the denial;
>
>    (2) Specific reference to pertinent plan provisions on
>    which the denial is based;
>
>    (3) A description of any additional material or
>    information necessary for the claimant to perfect the
>    claim and an explanation of why such material or
>    information is necessary; and
>
>    (4) Appropriate information as to the steps to be taken
>    if the participant or beneficiary wishes to submit his or
>    her claim for review.

Id.

Both Defendants' initial termination of benefits letter to Plaintiff (R. at 116) and the denial of his first appeal (R. at 16) meet these requirements, if at all, only at their most basic level. They are woefully lacking in any specificity. The former simply reads that "[b]ased on the medical documentation in our file and recent Independent Medical Exam, [Plaintiff is] able to perform other work." (R. at 116.) It then refers Plaintiff to enclosed appeals procedures. The second letter does little more than reiterate the earlier adjuster's assertion that Plaintiff "is capable of performing in at least a sedentary position." (R. at 16.) Fortunately for Defendants, the final appeal decision, however, did provide a detailed explanation for the denial of benefits. (R. at 222.)

Plaintiff contends that these first two bare bones letters, which denied benefits without anything but a conclusory explanation, did not provide adequate notice and that this fact alone is sufficient to evidence an abuse of discretion.[4] It is true that in the Fourth Circuit "generally 'where the plan administrator has failed to comply with ERISA's procedural guidelines . . . the proper course of action for the court is remand to the plan administrator for a 'full and fair review.'" Wertheim v. Hartford Life Ins. Co., 268 F. Supp. 2d 643, 660 (E.D. Va. 2003)(quoting Weaver v. Phoenix Home Life Mutual Co., 990 F.2d 154, 159 (4th Cir. 1993)(citations omitted)). In two circumstances, however, remand for further action is unnecessary. The first is where the evidence clearly shows that the administrator abused its discretion, see Weaver, 990 F.2d at 159, and the second is where the substance of the administrator's review was full and fair despite its failure to technically comply with all of ERISA's procedural requirements, Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 238 (1997). As the Fourth Circuit stated in Ellis, "the purpose of the specificity requirements in the notice provision is to permit the claimant to adequately prepare an appeal to the federal courts and for those courts to properly review the decision." Id.

In this Case, the final appeal letter decision meets that standard. As was the situation in Ellis, it "*substantively*

---

[4]In making this contention, Plaintiff ignores the fact that the final appeal did provide a thorough explanation for the denial of benefits.

-11-

*complied* with the spirit and intent of a full and fair review," and did not hamper Plaintiff's ability to adequately prepare an appeal. Id. at 239. As such, remand is inappropriate, and this Court may review the parties' claims on their merits.

In reaching this decision, the Court finds it significant that Plaintiff does not show that the insufficient notice of the first two denial letters deprived him of "a full and fair review by the appropriate named fiduciary." Plaintiff essentially argues that Defendants' failure to fully *describe* their review process to him in their first two letters somehow corresponds to a failure to *conduct* that process in a fair manner. But, no evidence supports this conclusory assertion. Plaintiff also contends that the conclusory process used by BMS did not give Dr. Stewart an opportunity to comment on the video before BMS made its decision. This is true, but Dr. Stewart was able to do so before the final review. Plaintiff does not show that a lack of notice prevented him from responding adequately on appeal or that Defendants neglected to consider all materials specifically because they failed to request such materials from Plaintiff. While it does appear that Defendants originally were going to end the process in a wholly unsatisfactory manner with the two conclusory BMS denial letters, they eventually granted the second appeal (R. at 190) which did provide an adequate review.[5]

---

[5]Defendants may wish to consider aligning their appeals procedures in future matters more closely with ERISA's procedural requirements. Like the defendant in Ellis, the Defendants in this case are "saved in this instance only
(continued...)

-12-

In this final letter, Defendants describe at length the Plan provisions and relevant materials they took into account in denying Plaintiff's appeal, including functional capacity evaluations ("FCE"), the IME of Dr. Rao, Plaintiff's affidavits, correspondence from Plaintiff's attorney, surveillance videotape footage, and the notes and statements of Dr. Stewart, Plaintiff's treating physician. (R. at 222-224.) Defendants also describe the role each piece of information played in their determination, set out the specific plan terms applied, and explain their rationale for discounting Dr. Stewart's recommendations as to Plaintiff's ability to work. (Id.) In short, this letter indicates that Defendants considered all the relevant evidence available regarding Plaintiff's injury and his present ability to work.

Having found that Plaintiff was ultimately not prejudiced by any procedural faults in this case, the Court next considers the Booth factors raised by Plaintiff. They are (1) whether the defendants gave sufficient consideration to all materials and the degree to which those materials support Defendants' decision, and (2) whether Defendants' decision was objectively and substantially

---

[5](...continued)
because the *substance* of the review . . . was full and fair, even though it did not technically comply with all of ERISA's procedural requirements." Id., 126 F.3d at 238. In fact, the instant case presents a closer issue than in Ellis, where the *initial* denial was sufficient. In that case, the plaintiff could be advised of any deficiencies which needed to be corrected. In the instant case, Defendants gambled that Plaintiff was not in any way prejudiced by the prior technical procedural violations. Moreover, in the instant case, it appears that Defendants almost stopped the review process with the wholly inadequate BMS review.

-13-

reasonable when taking their conflict of interest into account.⁶ Plaintiff primarily contends that, in making their decision, Defendants gave undue weight to Dr. Rao's evaluation, the FCE reports, and the surveillance video, while improperly discounting his treating physician's notes and recommendations and his own subjective complaints of pain. In deciding whether the Defendants abused their discretion by terminating Plaintiff's benefits, the Court must examine the explanation provided by Defendants in their letter denying Plaintiff's final administrative appeal.

The Fourth Circuit has held that it is not an abuse of discretion for a plan administrator to deny benefits when faced with conflicting medical evidence. Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999). Further, the Supreme Court has explicitly held that ERISA plan administrators are not required to give any special deference to the opinions of treating physicians over other credible opinions and materials. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). In this case, Defendants had reason to believe that Dr. Stewart's evaluations regarding Plaintiff's ability to work rested in large part on subjective pain complaints, the credibility of which was substantially undermined by the remainder of the record. While a treating physician may feel compelled to "accept a patient's

---

⁶These are the only two factors (in addition to procedural flaws) addressed by Plaintiff in his briefs, and, as such, are the only factors discussed at length in this recommendation. However, they are the important ones in this case and the Court has fully considered all of the Booth factors in making its final decision.

-14-

subjective complaints, the same is not required of a plan administrator in determining eligibility for benefits." <u>Williams v. UNUM Life Ins. Co. of Am.</u>, 250 F. Supp. 2d 641, 649 (E.D. Va. 2003). Instead, the administrator and the Court should consider the degree to which subjective complaints are supported by objective evidence of disability and the degree to which other evidence refutes such claims. <u>See</u> <u>Id.</u>

Dr. Stewart's evaluation of Plaintiff is, of course, not devoid of any objective support. In particular, the MRI results demonstrate that Plaintiff suffers from lumbar spinal stenosis, epidural fibrosis, lumbar facet arthropathy, and post laminectomy syndrome. (R. at 79; R. at 219.) Even Dr. Rao acknowledges the MRI results in his IME, stating that Plaintiff "may be [a] candidate for endoscopic scar tissue removal if the pain continues to limit his ability to function." (R. at 56.) However, Dr. Stewart's evaluations rely on accepting Plaintiff's subjective complaints of pain. Thus, in his last letter, he summed up Plaintiff's condition as follows:

> It is reasonable for any patient with chronic pain to have "good" days and "bad" days. It does not seem inappropriate to me that Mr. Larson could work for two hours in his yard one day, and pay for it the next day with increasing pain."

(R. at 219, ¶ 2.)

Dr. Stewart's evaluation does not constitute proof of the pain or level of such pain. And, the fact that Plaintiff has an objectively diagnosed condition that could produce pain does not

-15-

mean that Plaintiff experienced disabling pain and could not engage in any gainful occupation. In fact, there is substantial contradictory evidence for both the pain and the ability to work issues, and some of it is objective.

First, the March 2004 FCE report, which Defendants were entitled to request after 24 months of LTD benefits,

> concluded that plaintiff could perform at least sedentary occupations and up to medium physical demand level occupations. (R., pg. 127) Even though plaintiff's doctor found that this FCE 'showed consistent reliable performance', he rejected the 2004 FCE report due to <u>suspected</u> pain considerations, without any further examination, diagnosis, or explanation. (R., pg. 123).

(Defs.' Reply Br. at 6)(footnotes omitted). Yet, the "suspected" pain appears only to be Plaintiff's self-reported complaints. Further, Dr. Rao, who reviewed the same FCE and MRI, concluded that Plaintiff would be able to perform a sedentary job. (R. at 56.) Given the conclusory and assumptive nature of Dr. Stewart's opinion, it clearly could be discounted and, moreover, it is contrary to other qualified opinions.

The evidence most clearly contradictory to Plaintiff's claim and Dr. Stewart's opinions is the surveillance footage of Plaintiff from March 30, 2005. The video was taken at the very time Dr. Stewart accepts the credibility of Plaintiff's self-reported complaints of pain. In this video, Plaintiff easily lifts and carries heavy bags, repeatedly engages in stooping, pulling, pushing, and turning actions as he works in his yard, and walks for

-16-

upwards of an hour, never with a hint of a limp or other discomfort. Defendants' denial letter points out that these activities, on their face, cast doubt on Plaintiff's claims and credibility, but in addition, "flatly contradict Mr. Larson's March 9th affidavit" (R. at 224) in which he states that "the only thing I am able to carry in is something light like a loaf of bread" (R. at 89). For these reasons, Defendants discounted Dr. Stewart's and Plaintiff's explanation that Plaintiff has "good days and bad days."

This decision by Defendants was not unreasonable for the reason stated. Plaintiff cites <u>Hines v. Unum Life Ins. Co. of America</u>, 110 F. Supp. 2d 458 (W.D. Va. 2000), for the proposition that surveillance videos have little relevance because a plaintiff can have good and bad days. However, in <u>Hines</u>, unlike here, the plaintiff's problem allegedly originated from workplace stress, whereas the instant Plaintiff's problems are allegedly present at all times and places. Second, there was not conflicting medical evidence and the video did not show activities that the plaintiff claimed she could never perform. In the instant case, Plaintiff is performing rather heavy labor far beyond that which he claimed he could perform. This certainly could lead the Defendants to find that the video "cast doubt on the credibility of [Plaintiff's] subjective reports of pain to his treating physician, which are the primary basis for Dr. Stewart's opinion that Mr. Larson cannot

return even to sedentary employment." (R. at 224.) This Court may not substitute its judgment for that of the Administrator so long as Defendants did not act in an arbitrary or unprincipled manner, and they did not.

Finally, Plaintiff argues that Defendants erred in relying on the FCE report, the IME, and the surveillance video. For the FCE, Plaintiff states that an examination of five hours over two days does not show that he could work for eight hours.[7] Also, Plaintiff complains because the test was denominated "Upper Extremity Isernhagen Functional Capacity Evaluation" and concludes the test is flawed "because it ignores the lower extremity requirements of different types of work." (Pl.'s Resp. at 11.) However, this is merely a conclusory observation without any indicia of being correct. For example, the test evaluates for sitting tolerance, floor to waist lift, carry strength, climbing, etc. Moreover, even if the test were limited, that would only reduce its relevance, not rule out using it altogether. Furthermore, Dr. Stewart did not say the test was of no value, he merely concluded from Plaintiff's subjective complaints of pain that the test would be of limited value. Of course, if Dr. Stewart were wrong about the level of

---

[7]Plaintiff cites Stup v. UNUM Life Ins. Co. of America, 390 F.3d 301 (4th Cir. 2004), for the proposition that unless the FCE lasts the length of a work day, it is of no value. Of course if that were true, then all FCE's would be of no value unless they exactly duplicated the work day. Stup actually stands for the proposition that a lone and tentative, equivocal evaluation of an FCE by a physical therapist will not constitute substantial evidence when it is contradicted by the other evidence.

-18-

Plaintiff's pain, then his opinion would seem to approve of the FCE.[8]  And, Dr. Rao did find the test to be of value.

One may assume that the FCE report, IME, and the video would not themselves reveal the total picture with respect to Plaintiff's condition and ability to work.  That does not call for refusing to consider them any more than would it be proper to totally ignore Dr. Stewart's reports for the same reason.

In short, Defendants' decision to terminate Plaintiff's LTD benefits was the result of a deliberate, principled reasoning process, and the record clearly contains substantial evidence to support Defendants' conclusion.  As a result, the decision did not constitute an abuse of discretion, even under the adjusted standard of review.

## Conclusion

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary judgment (docket no. 16) be granted, that Plaintiff's motion for summary judgment (docket no. 19) be denied, and that this action be dismissed.

_____
**United States Magistrate Judge**

February 22, 2007

---

[8]Dr. Stewart found a July 2003 FCE difficult to interpret because Plaintiff gave less than full effort because of his alleged pain. (R. at 78.) He, again, did not say the FCE has no value.